IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2019

**IN RE H. A., ET AL.**

**Appeal from the Juvenile Court for Cocke County**
**No. 05621     Brad Lewis Davidson, Judge**

_____

**No. E2018-01914-COA-R3-PT**

_____

Mother appeals the termination of her parental rights, arguing that termination was not in the children's best interest. We conclude that clear and convincing evidence supports both the grounds for termination found by the trial court and the trial court's best interest determination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which RICHARD H. DINKINS and JOHN W. MCCLARTY, JJ., joined.

Ryan T. Logue, Dandridge, Tennessee, for the appellant, Jessica L. A.

Herbert H. Slatery, III, Attorney General and Reporter;  Amber L. Seymour, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**Background**

Respondent/Appellant Jessica L.A. ("Mother") is the parent of two children, a daughter born in 2010 ("Daughter"), and a son born in 2012 ("Son"). In March 2016, the Tennessee Department of Children's Services ("DCS") received a referral regarding Mother's drug use, lack of supervision, and environmental concerns. Upon investigation, Mother admitted to using illegal drugs. DCS removed the children on March 24, 2016. On June 16, 2016, the Cocke County Juvenile Court ("the trial court") adjudicated the children dependent and neglected.

DCS developed four permanency plans following the removal of the children. Generally, the plans were aimed at addressing Mother's drug and environmental issues. As such, the first plan required Mother to undergo an alcohol and drug assessment, follow recommendations, submit to random drug screenings, ensure her home is free from illegal activities, complete both a psychological evaluation and a parenting assessment, maintain a home free of garbage, and demonstrate appropriate parenting during visitation. Prior to the creation of the second plan, Mother completed both the alcohol and drug assessment and the psychological evaluation; as such, the subsequent plans required that Mother follow the recommendations from the assessments and refrain from incurring new criminal charges. Mother thereafter completed her parenting assessment. The third plan included an additional requirement that Mother not allow Mother's boyfriend ("Boyfriend") to have contact with the children due to a domestic dispute. The final plan added as an additional requirement that Mother participate in intensive outpatient treatment for substance abuse, as well as further outpatient treatment following the completion of that program. Mother completed many of the requirements of the plans, including attending several hours of parenting classes and submitting to random drug screens.

Mother was unable, however, to maintain her home or to remain free from additional criminal charges. For example, following the removal of the children, Mother was evicted from her home for failure to pay rent. Mother thereafter moved into a two-bedroom rented home with her own mother ("Maternal Grandmother"). Mother was also arrested in September 2017 and April 2018: both charges appear to result from Mother's failure to appear on a driving on a revoked license charge.

DCS filed a petition to terminate Mother's parental rights on February 27, 2018.[1] The petition alleged grounds of substantial non-compliance with permanency plans, abandonment by failure to establish a suitable home, persistence of conditions, and failure to manifest a willingness and ability to assume custody of the children. A trial occurred on September 18, 2018.

Mother's lack of safe and reliable transportation was an issue at trial. According to testimony from DCS Social Services Team Leader Dwayne Powers, Mother once attempted to drive the children during a scheduled visitation without car seats. Mother believed that it was "okay for the children to be transported without safety seats," despite the fact that the children were clearly required to be placed in safety seats pursuant to the law. By the time of trial, Mother did not have a driver's license and had twice been arrested for failing to appear on a charge of driving on a revoked license. When asked if Mother currently had transportation, Mother testified that she did, but then later admitted that she did not have a current driver's license. Mother then stated that her transportation

---

[1] The petition also alleged grounds to terminate the parental rights of the children's father. He did not appear at trial and is not a party to this appeal. As such, we have recited the facts relevant only to the allegations against Mother.

was Maternal Grandmother, who had her driver's license. Mother immediately admitted, however, that Maternal Grandmother did not have a license and stated that their transportation was in fact a friend of Maternal Grandmother. Mother then admitted that the friend did not in fact drive her to court, but that her brother provided her with transportation, driving Maternal Grandmother's car. Mother testified that the car had no insurance because they only purchased the car "this month."

Allegations of sexual abuse and domestic violence were also present in this case. Following the removal of the children, Mother and Boyfriend had an incident of domestic violence, leading DCS to prohibit Mother from bringing the children around Boyfriend in the third permanency plan. Later, Son began exhibiting some behaviors that led DCS to have "sexual concerns."[2] Upon investigation, the child stated that Boyfriend was a perpetrator of this abuse. As such, a permanency plan was entered in May 2017 prohibiting Boyfriend from being around the children. Whether Mother complied with this order was somewhat unclear. At one point, Mr. Powers testified that he had no knowledge of Mother violating the no contact provision with regard to Boyfriend. At another point, however, Mr. Powers testified that the children indicated that Boyfriend "was around during some of the visits."

The children's behavioral problems led DCS to change their foster home on multiple occasions. Eventually, the children's guardian ad litem filed a motion to prohibit any contact between Mother and the children on the basis of reports of sexual abuse of the children perpetrated by Mother; the no contact order was eventually granted on the basis of these allegations. Following the no contact order, the children's behavior improved dramatically. In fact, by the time of trial, they had remained in a single foster home for several months and their current foster parents wish to adopt them. Finally, Mr. Powers testified that there were "substantiated" allegations of "a sexual nature" against Mother's brother, whom DCS believed resided with Mother. In her testimony, Mother did not in any way deny these allegations of sexual abuse, but stated that only she and Maternal Grandmother are residents of her current home.

Drug use in the home was also an issue, as the children were initially removed from Mother's home due to allegations of drug use. Mother apparently admitted at that time to using illegal drugs. Mother thereafter completed an alcohol and drug assessment and participated in random drug screenings;[3] no testimony was presented that Mother had failed any drug screenings following the children's removal. Mother reported during one assessment, however, that Maternal Grandmother continued to use drugs in the home. At the time of trial, however, Mother testified that Maternal Grandmother had stopped using drugs, despite not participating in any drug cessation program or treatment. Because of

---

[2] Exhibits in the record indicate that Son is required to attend bi-weekly therapy appointments "to address his sexual reactive behaviors."

[3] Mr. Powers testified that DCS helped Mother to obtain these services, along with facilitating phone calls and supervised visitation, and providing medical care for the children. Exhibits in the record also indicate that DCS provided funding for a psychological evaluation.

the allegations of sexual abuse and drug use in the home, DCS did not perform any visits to the home where Mother now resides.

DCS also expressed some concerns over Mother's conduct during visits and throughout the pendency of this case. According to Mr. Powers, Mother was not engaged during the visits, choosing to be on her phone rather than participating with the children. During one visit, Son began climbing on a bookcase; Mother did not notice or intervene until the issue was pointed out by the supervisor. An exhibit in the record detailed other visits where Mother did not engage with the children, nor did she show any affection for the children throughout the visits. Another troubling incident occurred in November 2017 where Son needed surgery to correct an ear issue. DCS was able to contact Mother to explain the necessity of the surgery and obtain her consent. Mother, however, subsequently refused to provide her consent, explaining that she did not wish the child to undergo the procedure. DCS thereafter petitioned the trial court for an emergency order allowing the surgery, due to concerns that the child's hearing could be permanently impaired due to numerous ear infections. Mother did not appear for the hearing and the trial court granted DCS's motion. Although Mother was permitted to attend the children's medical visits prior to the suspension of contact, Mr. Powers testified that she failed to attend all appointments.[4] Mother also testified that she had completed both the intensive outpatient treatment recommended following her psychological evaluations, as well as weekly therapy sessions; Mother was unable to provide proof regarding the completion of either requirement.[5]

Mother paid no support for the children during the time that the children were in DCS custody. According to Mother, however, she and Maternal Grandmother's only income results from disability benefits, which were not sufficient to pay their expenses and pay support for the children.[6] Mother testified, however, that they would be able to support the children should they be returned to her custody. Mother also claimed to have purchased clothes for the children, which clothing she placed in storage; Mother admitted that she never attempted to give the clothes to the children despite them being in DCS custody for more than two years. There was no dispute, however, that Mother did provide snacks and drinks for the children during visitations.

The trial court issued an oral ruling at the close of proof. Therein, the trial court ruled that clear and convincing evidence supported the grounds of abandonment by failure to establish a suitable home, persistence of conditions, and willingness and ability to assume custody of the children. The trial court, however, found that insufficient evidence had been presented to support the ground of substantial noncompliance with permanency plans. The trial court further ruled that termination of Mother's parental

---

[4] The record shows that Son has significant health problems that require a multitude of monthly appointments.
[5] An exhibit in the record does indicate that Mother attended at least three family therapy sessions prior to May 2017.
[6] Both Mother and Maternal Grandmother receive disability benefits.

- 4 -

rights was in the children's best interests. The trial court entered a written order terminating Mother's parental rights on October 16, 2018. From this order, Mother appeals.

## Issues Presented

Mother raises a single issue in this appeal: whether the trial court erred in finding clear and convincing evidence that termination of Mother's parental rights is in the children's best interest. Pursuant to this Court's duty established in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), we will also consider whether clear and convincing evidence establishes the grounds for termination found by the trial court. *Id.* at 525–26 ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## Standard of Review

The Tennessee Supreme Court has explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. §

36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523−24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## Discussion

## Grounds

The trial court found three grounds to terminate Mother's parental rights: (1) abandonment by failure to establish a suitable home; (2) persistence of conditions; and (3) failure to manifest a willingness and ability to assume custody. We will briefly consider each ground in turn.

## I.

Abandonment is a statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of this appeal, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).[7] "A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016)

---

[7] In July 2018, section 36-1-102(1)(A) was amended to define this type of abandonment as

(ii)(a) The child has been removed from the home or the physical or legal custody of a

(quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). "It requires that the home be free of drugs and domestic violence." *Id.* (quoting *In re Hannah H.*, 2014 WL 2587397, at *9). Additionally, "[a]ppropriate care and attention must be given to the child. Accordingly, a parent's compliance with counseling requirements is 'directly related to the establishment and maintenance of a suitable home.'" *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (internal citation omitted) (quoting *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)).

The children were removed from Mother's home on March 24, 2016 and adjudicated dependent and neglected on June 16, 2016. The trial court specifically found that DCS exhibited reasonable efforts throughout the entirety of the time that the children were in foster care. Mother does not dispute the trial court's finding of reasonable efforts and the record does not preponderate against it.

Moreover, the evidence supports the trial court's determination that clear and convincing evidence was presented as to this ground for termination. Although Mother did complete many of the tasks outlined on her permanency plans, she provided no proof of her claim of completion of an intensive outpatient treatment program and generally failed to follow the recommendations that resulted from her assessments.[8] While there

---

parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. Because this amendment did not become effective until July 1, 2018, following the filing of the termination petition at issue, there is no dispute that the above language is inapplicable in this case. *See id.*

[8] An exhibit in the record indicates that the intensive outpatient treatment was required following an psychological assessment due to Mother's history of drug addiction.

was no proof that the physical environment of Mother's home was inappropriate, the trial court expressed serious concern over continuing drug use and sexual abuse in the home. Indeed, Mother had previously admitted that Maternal Grandmother used drugs in the home only to claim that Maternal Grandmother had unilaterally stopped using all illegal drugs by the time of trial. Likewise, this case involves such serious allegations of sexual abuse perpetrated by Mother and those she surrounds herself with that all contact with the children was terminated on September 26, 2017. Since that time, the record does not reflect that Mother made any attempt to refute these allegations, obtain treatment, or regain visitation in any manner. Finally, the record reflects issues concerning Mother's supervision of the children, as illustrated by her failure to engage during visitation, leading to a dangerous situation involving one child, as well as her inability to recognize the danger posed by transporting the children without safety seats. Although we must admit that the evidence concerning Mother's current home and her personal continued drug use was sparse at best, we conclude that clear and convincing evidence supports this ground for termination based on the considerations outlined above.

## II.

Another ground for termination is referred to as persistence of conditions:
The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[9] As previously discussed, the children were adjudicated dependent and neglected on June 16, 2016, roughly twenty months prior to the filing of the termination petition. As such, this ground is clearly applicable.

---

[9] This ground for termination was also amended in 2018. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The current version of the statute provides a ground for termination where

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage

Again, the evidence presented on this ground was minimal, but largely undisputed. The conditions that led to the removal of the children were issues of drug use, environmental concerns, and lack of supervision. We note that DCS presented no proof that Mother continued to use drugs or that she had ever failed a random drug screen following the removal of the children. Mother admitted, however, that Maternal Grandmother had used drugs in their home, but claimed that Maternal Grandmother had stopped using drugs by the time of trial. Likewise, DCS presented no proof of environmental conditions in Mother's current home, as DCS had never visited this home. Issues of lack of supervision, however, appear to persist, as Mother did not appear to properly supervise the children during visitations, did not have proper safety equipment to transport the children, and currently does not have transportation with proper insurance.

Moreover, other conditions exist that would cause the children to be subjected to further abuse and neglect, including issues related to sexual abuse that came to light following the removal of the children. Likewise, it appears that Mother has continued to engage in criminal activity throughout the pendency of this case. For example, Mother has twice been arrested for failure to appear on a charge of driving on a revoked license, once as late as April 2018, months following the filing of the termination petition. By the time of trial, Mother still did not have a proper driver's license. Given the more than two years that the children had been in DCS custody without substantial progress on these issues, it appears unlikely that they will be remedied at an early date. Moreover, there can be no dispute that continuance of the relationship between Mother and the children greatly diminishes their chances of early integration into a permanent home. Indeed, the evidence shows that while having visitation with Mother, the children had such severe behavioral issues that they were required to change foster homes on multiple occasions;

of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

Again, neither party argues that this Court should apply the current version of the statute; as such, we apply the version in effect at the time the termination petition was filed.

once visitation was terminated, the behavioral issues subsided and the children were able to be placed in a more stable foster home that wishes to adopt the children. The trial court therefore did not err in finding clear and convincing evidence to support this ground for termination.

### III.

Turning to the final statutory ground found by the trial court, parental rights can be terminated when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). We have previously held that evidence was sufficient to meet this ground when it showed that the parent voluntarily chose to live a lifestyle lacking stability. *See **In re Morgan K.***, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *13 (Tenn. Ct. App. Oct. 31, 2018).

Mother has generally shown an unwillingness to parent her children. Importantly, at trial, Mother did not in any way deny the sexual abuse allegations that had been levied against her. Likewise, Mother has often acted in a manner that shows little regard for the children, including attempting to transport the children without necessary safety equipment, refusing to consent to necessary medical care for Son, and continuing to engage in criminal activity. Thus, Mother's actions have shown that she had neither the ability nor the willingness to take the steps necessary to resume custody of her children. Likewise, given the marked improvement in the children's wellbeing following the total removal of Mother from their lives, it appears that returning the children to her custody would pose a substantial risk of psychological harm to the children. As such, the trial court did not err in finding clear and convincing evidence to support this ground for termination.

### Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the children's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." ***In re Audrey S.***, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. ***Id.***

- 11 -

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

The trial court found that clear convincing evidence supported DCS's contention that termination was in the children's best interest. Following our review of the record, we reach the same conclusion. It is questionable whether Mother has made an adjustment of circumstances sufficient to allow return of the children in light of the reasonable efforts made by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Mother does appear to have made some significant strides, including attending parenting classes, taking part in several assessments, passing random drug screenings, and participating in some family therapy sessions. Despite this progress, Mr. Powers testified that Mother did not participate in intensive outpatient treatment as recommended by her psychological evaluation. Although Mother testified that she completed this treatment, she offered no details of the treatment, nor did she provide any proof to support her claim. Moreover, it does not appear that Mother has taken any affirmative steps in light of the sexual abuse allegations. Mother also continued to incur criminal charges following the filing of the termination petition and still has no valid driver's license or car with insurance in which to transport the children. Under the totality of the circumstances, we must therefore conclude that these factors weigh somewhat in favor of termination.

Other factors weigh more heavily in favor of termination. Although Mother did maintain visitation with the children prior to the entry of the no contact order, Mother was not engaged in the visitation and often allowed unsafe behavior to take place. *See* Tenn. Code Ann. § 36-1-113(i)(3). Consequently, it appears that the children do not have a particularly meaningful relationship with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(4). Rather, the children are strongly bonded with their foster parents, and Daughter sometimes refers to foster mother as "mom." Moreover, due to allegations of sexual abuse perpetrated by Mother, all contact with Mother was eventually suspended. *See* Tenn. Code Ann. § 36-1-113(i)(6). Following the suspension of contact, the children have markedly improved. As such, a change in caretakers would likely have a serious, detrimental effect on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5).

Mother did testify that she is living in an appropriate home for the children. We are not persuaded, however, by Mother's claim that Maternal Grandmother stopped using drugs in the home or that a lasting change has occurred with regard to drug use in the home. *See* Tenn. Code Ann. § 36-1-113(i)(7). Likewise, although Mother claimed that only she and Maternal Grandmother lived in the home, DCS previously had concerns about substantiated sexual abuse allegations against Mother's brother, who was apparently also residing in the home for a time; Mother still clearly had contact with her brother, as he drove her to the termination hearing. *See* Tenn. Code Ann. § 36-1-113(i)(6). Moreover, Mother's failure to undergo the recommended intensive treatment, coupled with her other actions showing a general disregard for the children's welfare, lead this Court to question Mother's mental and emotional fitness to safely parent the children. *See* Tenn. Code Ann. § 36-1-113(i)(8). Mother has also not paid child support in the time that the children have been in foster care, although she did take snacks and drinks to her scheduled visits. *See* Tenn. Code Ann. § 36-1-113(i)(9).

Finally, the evidence in the record clearly shows that the less contact with Mother the children have, the better they are. In a similar situation involving evidence that the more time spent with the father, "the more the child's mental health has deteriorated," we concluded that clear and convincing evidence supported the trial court's determination that the child's best interests were served by terminating the parent-child relationship. ***In re Daymien T.***, 506 S.W.3d 461, 477 (Tenn. Ct. App. 2016) ("Clearly, Father's increased involvement in the child's life has not led to better outcomes for the child, but in fact, has led to a worsening of the child's mental health."). The same is true in this case. As such, clear and convincing evidence establishes that termination of Mother's parental rights is in the children's best interest.

## Conclusion

The judgment of the Juvenile Court of Cocke County is affirmed in all respects and remanded for any further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Jessica L.A., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE